IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

RICHARD E. REWIS,                )
                                 )   NO. 4:03-cv-30485
          Plaintiff,             )
                                 )   RULING ON
     vs.                         )   DEFENDANTS' MOTION
                                 )   FOR SUMMARY JUDGMENT
IOWA DEPARTMENT OF               )
CORRECTIONS and STATE OF IOWA,)
                                 )
          Defendants.            )

        This matter is before the Court on defendants' motion for
summary judgment [20]. Plaintiff Richard Rewis, a correctional
officer with the Iowa Department of Corrections (IDOC), alleges
that defendants harassed and discriminated against him because of
his gender, and retaliated against him when he complained, in
violation of 42 U.S.C. § 2000e-5, *et seq.*[1] The matter is before me
pursuant to 28 U.S.C. § 636(c). Hearing on the motion was held on
November 14, 2005. The matter is fully submitted.

## I.

### SUMMARY JUDGMENT

        Defendants are entitled to summary judgment if the
affidavits, pleadings, and discovery materials "show that there is

---

        [1] Originally plaintiff also brought claims under the parallel
provisions of Iowa Code Ch. 216 in Count II of the Complaint.
Plaintiff did not resist defendants' May 7, 2004 motion to dismiss
on Eleventh Amendment immunity grounds. The Court granted the
motion by order entered June 21, 2004 and dismissed Count II. The
federal claims are the sole claims now at issue in this lawsuit.

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Erenberg v. Methodist Hospital</u>, 357 F.3d 787, 791 (8th Cir. 2004)(quoting Fed. R. Civ. P. 56(c)). The Court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them, "that is, those inferences which may be drawn without resorting to speculation." <u>Mathes v. Furniture Brands Int'l, Inc.</u>, 266 F.3d 884, 885-86 (8th Cir. 2001)(citing <u>Sprenger v. Federal Home Loan Bank of Des Moines</u>, 253 F.3d 1106, 1110 (8th Cir. 2001)); <u>see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Erenberg</u>, 357 F.3d at 791; <u>Tademe v. St. Cloud State University</u>, 328 F.3d 982, 987 (8th Cir. 2003); <u>Lambert v. City of Dumas</u>, 187 F.3d 931, 934 (8th Cir. 1999); <u>Kopp v. Samaritan Health System, Inc.</u>, 13 F.3d 264, 269 (8th Cir. 1993). An issue of material fact is genuine if it has a real basis in the record. <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395 (8th Cir. 1992) (citing <u>Matsushita</u>, 475 U.S. at 586-87 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." <u>Hartnagel</u>, 953 F. 2d at 395 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)); <u>see Hitt v. Harsco Corp.</u>, 356 F.3d 920, 923 (8th Cir. 2004); <u>Rouse v. Benson</u>, 193 F.3d 936, 939 (8th Cir. 1999).

It is the nonmoving party's obligation to "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." Rouse, 193 F.3d at 939; see Hitt, 356 F.3d at 923. In assessing a motion for summary judgment a court must determine whether a fair-minded trier of fact could reasonably find for the nonmoving party based on the evidence presented. Anderson, 477 U.S. at 248; Herring v. Canada Life Assurance Co., 207 F.3d 1026, 1030 (8th Cir. 2000).

## II.

### FACTUAL BACKGROUND

Plaintiff Richard Rewis began working for IDOC in 1980 as a correctional officer at the Iowa State Penitentiary (ISP). He left the position for a year and returned to IDOC in 1982, working as a correctional officer through 1987. In 1987 he became a senior correctional officer at ISP. Between 1989 and 1997 Rewis worked as a correctional supervisor I at ISP. In 1997 he was promoted to correctional supervisor II.  In March or May of 1997 he transferred to the Newton Correctional Facility (NCF) in the same position. (Def. App. at 138-141).

In March 2000 Rewis was hired to work as a unit manager at the Iowa Correctional Institution for Women (ICIW). Deputy Warden, Greg Ort, was primarily involved in the hiring decision, though Superintendent (Warden) Diann Wilder-Tomlinson was as well.

Rewis has testified Ort told him at the time of hire he would be assigned an assistant unit manager and a secretary to work in his unit.[2] (Pl. App. at 72). Ort left in the middle of 2000 and was replaced by Sheryl Baney, then known as Sheryl Lockwood.[3] In July 2000, before he left, Ort conducted a six-month performance review with Rewis. He found Rewis met job expectations in every category. (Id. at 58-67).

ICIW was transitioning to a unit management system. The prison was also expanding and new units were being built. Other than Paul Rode, treatment director at ICIW, Rewis was the only male in the chain of command. The other unit managers hired or promoted around the same time as Rewis were Robin Bagby, Jill Dursky and Carol Smith (who had been working at ICIW since 1983), all females. Robin Bagby, who was hired in December 1999, did not have inmates or staff to supervise until her unit, Unit 9, was completed in March or April 2000. (Pl. App. at 118). Carol Smith assumed responsibility for units 3 and 4, which already housed inmates, when she was promoted to unit manager. (Def. App. at 194-96). Jill Dursky, who started the same day as Rewis, had responsibility for units 1, 2, 7 and 8 after she spent some time going over

---

[2] At hearing, for purposes of the motion defendant agreed Ort made this promise.

[3] To avoid confusion, throughout this ruling the Court has referred to Baney by her current name, even though the summary judgment record refers to her as Lockwood.

institutional policies and procedures, along with Rewis. (<u>Id.</u> at 60-61).

From the start Rewis' job duties included supervising the inmates on Unit 6 (then a 46-bed lock-up unit), overseeing maintenance of the unit, supervising and training staff, writing policies and procedures for the new unit, preparing handbooks for his unit, hearing reports and performing custody classifications. Additionally, Rewis was assigned responsibilities relating to the construction going on within the institution. When new Unit 6B opened in December 2000, Rewis supervised an additional 40-50 inmates. (Pl. App. at 70).

There is a dispute about whether Rewis' job duties were more onerous than those of the female unit managers, but for the purposes of the present motion the Court accepts his testimony to the effect that overall the duties assigned to him were significantly more burdensome. The inmates Rewis supervised were in a lock-up status. Inmates in lock-up require more work in the form of additional classifications, responding to "kites" (inmate complaints or requests), and handling the minor reports for rule violations which lock-up inmates disproportionately generate. (Pl. App. at 71-73). Rewis was also assigned to inspect on-going maintenance work associated with the new construction throughout the institution. This entailed doing "punch orders," daily check-up

on maintenance being performed, and escorting the outside contractor overseeing the work. (Id. at 71).

Three assistant unit managers were hired and began work on January 3, 2001: Mary Monds, John Mays and Kathy Eschen. They were assigned to the units supervised by Bagby, Smith and Dursky. The assistant unit managers worked the second (evening) shift, and assisted in supervision, preparing reports, classifications and various other paperwork that went along with managing a prison unit. Due to state budget problems, the assistant unit managers were laid off on January 18, 2002.

There is a dispute about whether Rewis had access to the assistance of the assistant unit managers beyond minor clerical functions such as post orders. Baney has testified the three assistant unit managers were to be shared by the four unit managers and there was insufficient funding to hire a fourth assistant unit manager. (Def. App. at 30, 32, 38; see Aff. of Wilder-Tomlinson). On several occasions Rewis complained to Baney about not having an assistant unit manager assigned to his unit. (Def. App. at 38; Pl. App. at 73). Rewis has testified he and fellow unit managers Dursky and Smith talked about having the latters' assistant unit managers make evening rounds on Rewis' Unit 6. Later Dursky and Smith told him they had talked to Baney and been instructed by her that their assistant unit managers were not to go on Unit 6. (Pl. App. at 73-74). By affidavit, Superintendent Wilder-Tomlinson states that

because Rewis' Unit 6B "worked closely with the Duty Officer and the Shift Supervisor's office," the institution decided not to assign an assistant unit manager to that unit. (Aff. of Wilder-Tomlinson). For present purposes the Court accepts Rewis' testimony that the assistant unit managers were both assigned to other units and not permitted to provide him with significant assistance in performing his duties.

Prior to the opening of new Unit 6B, Rewis was to have completed handbooks for the orientation unit, the federal detainees, and a county confinement rule book. These were not completed before Unit 6B opened in December 2000. Defendants assert the opening was delayed by construction and by Rewis' failure to complete policies and procedures for the unit. Baney and the other unit managers have testified that they offered to help Rewis complete his work. (Def. App. at 25, 40-41, 71, 197-98). Rewis denies they offered any significant assistance.

Rewis contends he was unfairly criticized and ridiculed on several occasions. As the Court understands his deposition testimony, on one occasion when Rewis delivered a trip sheet to the shift captain's office, Baney, who was present, made a comment to those present something like: "This is not a traffic area. You guys need to get out of here." (Pl. App. at 75). At a subsequent meeting Baney told those present "I made Rewis mad because I made him get out of the captain's office." (Id.) Rewis believes Baney singled

7

him out because of his gender. On another occasion, Rewis was going to lunch with the other unit managers when the warden walked by and asked if that was what they were about to do. Baney was present and remarked: "No, they're just going out so Rick can talk about us." (<u>Id.</u> at 76). Lastly on this subject, Rewis arrived late for a management team meeting. The warden was chairing the meeting and pulled a chair up by the desk where she was sitting. She instructed Rewis: "You're late so you've got to sit up front" and everybody chuckled. (<u>Id.</u>) Rewis had never seen that done to anyone else. (<u>Id.</u>) In fact, he claims the next week Bagby showed up late and was not required to sit up front. (<u>Id.</u> at 77).

In early April 2001 Rewis applied to attend a mental health training. His request was denied. (Pl. App. at 100). Three female employees from ICIW were allowed to attend. (<u>Id.</u> at 4-5).

On or about April 16, 2001, Rewis was given a "special evaluation" by Baney. (Pl. App. Ex. 3). In the evaluation Baney rated Rewis as "Does Not Meet Job Expectations" in every particular and imposed numerous requirements for improvement, (<u>id.</u>), though she has testified the primary issues Rewis needed to address were completion of the handbooks and tardiness at meetings. (Pl. App. at 99, 104, 110, 114). She also testified the evaluation was intended to help Rewis complete certain job duties and was not punitive or a step towards termination. (Def. App. at 37, 39, 44, 46). Despite her testimony, the jury could conclude from the circumstances and

Baney's own testimony that in fact the evaluation was a step toward termination. This is implicit in Baney's testimony that Rewis was put on evaluation "in hopes that he would  complete those things [the items on which improvement was specified] and continue on with employment here." (Id. at 39).  Implicitly, if Rewis did not improve, he would not continue in employment. Rewis appears to have understood the evaluation to be notice to that effect. In response to Rewis' question to Baney about what would happen if he did not meet all the requirements laid out in the evaluation, Baney responded simply they hoped that would not happen. (Pl. App. at 103). Rewis' salary and duties were not reduced as a result of the special evaluation.

Rewis prepared a response to the evaluation in which he complained he had "requested repeatedly to have an assistant unit manager but the requests have not been approved. I have also requested assistance of such things as making rounds, supervising staff, etc., by current assistant unit managers" which had been denied by Baney. (Pl. App. at 16). He also wrote that Baney had never previously indicated to him his performance did not meet expectations. (Id. at 19). Rewis admits that at the time of the special evaluation he told Baney he did not like his job and did not like working with female offenders. (Pl. Resp. to Def. Stmt. of Facts ¶ 17).

On April 27, 2001 Baney and Dursky met with Rewis in an investigatory interview. (Pl. App. at 21-22). On April 24 and 25, 2001 Rewis had not sent "end of day" e-mails to the shift supervisor and Baney, one of the special evaluation requirements, and on April 27 he was 30 minutes late for an administrative meeting. (<u>Id.</u> at 21). Rewis explained he had been running late both nights and had stopped in the shift captain's office and attempted to send the e-mail, but the computer system would not let him in to accomplish that. (<u>Id.</u>) He had no reason for being late to the April 27 meeting, although in his deposition later he testified his late attendance was due to a sleep disturbance problem he attributed to his treatment at work. (<u>Id.</u> at 21, 80). As a result of his meeting with Baney, a letter of reprimand was sent out to Rewis on May 8, 2001. (<u>Id.</u> at 23-24).

Rewis did not return to work at ICIW after his April 27 meeting with Baney and Dursky. His doctor advised him he should not return to work at ICIW because of the stress of the job. (Pl. App. at 80-81).

On May 16, 2001, Rewis submitted non-contract grievances concerning the special evaluation and letter of reprimand. (Pl. App. at 20, 25). In the special evaluation grievance, Rewis complained that no other unit managers had been required to meet the conditions imposed as a result of the evaluation, and for the "remedy requested" asked "to be treated the same as females [sic]

unit manager." (Pl. App. at 20). Baney responded: "I have reviewed your grievance, the special evaluation was warranted due to performance issues. Your response has been noted. Grievance denied." (Id.) Baney evidently did not view the grievance as a complaint about gender discrimination. (Id. at 114-15).

In his reprimand grievance Rewis complained that in violation of IDOC policy he had not been told noncompliance with the special evaluation conditions would lead to discipline. (Pl. App. at 25). Baney responded: "Discipline was based on investigation into tardiness & supervisor directives. During the investigation employee was notified that it could result in discipline. Grievance denied." (Id.)

Prior to the special evaluation in April 2001 Rewis had contacted NCF Warden John Mathes about returning to NCF. He also talked to Susan Pritchard from the Iowa Department of Personnel about transferring back to Newton as a correctional officer. These initial inquiries proved unavailing, but Rewis renewed the effort after his doctor told him he should not return to work at ICIW.

On May 29, 2001 Rewis wrote to Terry Mapes, the new warden at NCF, requesting a voluntary demotion from his current position at ICIW to facilitate a transfer to NCF. (Def. App. at 97, 241). The Iowa Administrative Code gives appointing authorities discretion to grant employee written requests for demotion. 11 IAC § 59.4. Prior to requesting the demotion, Rewis had retained legal

counsel who had been in discussions with IDOC in an effort to resolve Rewis' employment difficulties, a fact known to Mapes. (Pl. App. at 127).

NCF created a correctional counselor position for Rewis. (Def. App. at 106). Before it could be given to him the job had to be posted for bidding by other employees. It was posted on August 31, 2001. (<u>Id.</u> at 242). No bids were received and Rewis was allowed to take the position. Through his attorney Rewis was informed he could start work as a correctional officer at NCF on September, 4, 2001. (Pl. Resp. to Def. Stmt. of Facts ¶ 66).

The shift for the new correctional counselor position described on the job posting was for 1:00 p.m. to 9:00 p.m. Tuesday through Friday, 8:30 a.m. to 4:30 p.m. Saturday, with Sunday and Monday off. (Def. App. at 242). Rewis did not inquire about the hours or days of work before accepting the position, but claims he did not need to since the shift description was set out in the Iowa Department of Personnel PDQ job description (PDQ) and the collective bargaining agreement. (Pl. App. at 41-43;, 84, 131). The PDQ listed the hours as "Any hours between 7:00 a.m. to 8:30 p.m." (<u>Id.</u> at 41). Mapes testified the PDQ related to a classification of positions rather than a specific position. (<u>Id.</u> at 131). He agreed the majority of correctional counselor positions would fall in the PDQ category, but that sometimes positions are created that start before or end after the listed time frame. (<u>Id.</u>)

12

Rewis complains about a number of what he contends were acts by the NCF administration in retaliation for having complained about discrimination at ICIW and hiring an attorney to assist him. Preeminent among these were his assigned work hours, particularly on Saturday. (Def. App. at 88, 175). No other correctional counselors were required to work on Saturday, none had done so previously, and if Rewis is believed there was no need for a correctional counselor to be present on the weekend. Rewis responded by requesting vacation for nearly every Saturday he was scheduled to work. (Pl. App. at 85). When this was denied he filed a grievance in which he claimed the rejection was the product of "discrimination, retaliation, and harassment." (<u>Id.</u> at 45). The grievance was denied on the basis there was no contract violation. (<u>Id.</u>) Rewis knows of no correctional counselors who have been permitted to take the first or last days of their work week off as vacation on a regular basis. (Pl. Resp. to Def. Stmt. of Facts ¶ 70).

Rewis says he was denied "flex time" on several occasions and has testified concerning one incident. On November 3, 2001 Rewis contacted his unit manager Larry Lipscomb about using flex scheduling instead of vacation to attend union steward training on November 7, 2001, as well as to attend a union meeting on November 6, 2001. (Pl. App. at 48). Lipscomb apparently contacted the Warden's office and responded to Rewis he could use flex scheduling

13

for the November 6 meeting, but was told he would have to use
vacation time for the November 7 meeting. (<u>Id.</u> at 48, 139).
Lipscomb was unaware Rewis had complained of discrimination at
ICIW. (Pl. Resp. to Def. Stmt. of Facts ¶ 83). Mapes testified he
thought Lipscomb was not aware at the time Rewis' request was for
a union purpose until the grievance was filed. (Pl. App. at 132).
In fact, attendance at a union meeting is a proper use of flex
time. (<u>Id.</u>) Rewis submitted a grievance about being unable to flex
schedule time off for the meeting, again complaining it was
"discrimination, retaliation, and harassment." (<u>Id.</u> at 47). The
grievance was denied on the basis there was no contract violation.
(<u>Id.</u>)

On November 7, 2001, Rewis showed up on his day off for
an all-staff meeting. (Pl. App. at 50, 89). Mapes did not allow
Rewis to attend the meeting because he was wearing jeans. (<u>Id.</u>)
Rewis filed a grievance regarding the incident. (<u>Id.</u> at 50). Mapes
testified he made a mistake as jeans were allowed at meetings at
the all-staff meeting. (Def. App. at 114-15). Rewis was not
disciplined for the incident. His grievance, which repeated the
allegations of discrimination, retaliation and harassment, was
denied as not being a contract violation. (Pl. App. at 50).

Rewis submitted a complaint to the Iowa Civil Rights
Commission on November 14, 2001 in which he made the sex

discrimination, harassment and retaliation claims he advances in this action. (Ex. 1 to Pl. Complaint).

In a January 2003 grievance Rewis complained that grievance procedures had not been followed because the NCF administration was not meeting with him and a union steward during the step process. (Pl. App. at 51). Deputy Warden Kristine Weitzell met with the steward and agreed the administration would meet on grievances "to the best of our ability." (Id.)

In June 2003 Rewis was denied vacation leave despite the fact he submitted his request 60 days beforehand. He submitted a grievance. (Pl. App. at 53). After meeting with the union steward, Weitzell noted officers were changing shifts during the requested time period, but some would be returning, which "should clear up some leave issues." (Id.)

As the Court understands the record, at about the time he was denied vacation Rewis was summoned to Lipscomb's office to talk about the vacation request and his work hours. Another correctional officer, a lieutenant, was present. During their discussion Lipscomb commented to Rewis that he was "caught in the middle" and "didn't like supervising like this" from which Rewis concluded Lipscomb had been instructed to have a witness present for the conversation. (Pl. App. at 87).

Finally, Mrs. Rewis was laid off from her job at NCF for budgetary reasons. Rewis contends that to retaliate against him the

prison did not offer her a unit manager job when one came open after her recall rights expired. (Pl. App. at 134-35).

Rewis has since taken another demotion to the position of correctional officer on the night shift. (Pl. App. at 90). This lawsuit was filed August 29, 2003.

### III.

### DISCUSSION

In his complaint Rewis makes three Title VII claims: gender-based harassment and sexual discrimination while he was at ICIW, and retaliation after he transferred to NCF. Defendants' motion challenges the sufficiency of the evidence to support all three claims.

### A.    Gender Harassment

Title VII prohibits harassment of an employee based on gender which results in a hostile work environment. To establish such a claim a plaintiff must show that

> (1) he or she was a member of a protected group; (2) he or she was subjected to unwelcome harassment in the workplace; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.[4]

---

[4] The fifth "knowledge" element only applies to claims of non-supervisory harassment. See Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 n.5 (8th Cir. 2000). Rewis claims his supervisor, Baney, and the warden were the source of the claimed harassment.

<u>Gilooly v. Missouri Dept. of Health and Senior Services</u>, 421 F.3d 734, 738 (8th Cir. 2005)(citing <u>Alagna v. Smithville R-II School Dist.</u>, 324 F.3d 975, 979 (8th Cir. 2003) and <u>Scusa v. Nestle U.S.A. Co.</u>, 181 F.3d 958, 965 (8th Cir. 1999)). Defendants' motion focuses on the fourth element which requires proof of a work environment "so intimidating, offensive, or hostile that it [was] 'poisoned. . . .'" <u>Gilooly</u>, 421 F.3d at 738 (quoting <u>Scusa</u>, 181 F.3d at 965). The plaintiff must be able to show "the workplace is permeated with discriminatory intimidation, ridicule, and insult." <u>Duncan v. General Motors Corp.</u>, 300 F.3d 928, 934 (8th Cir. 2002), <u>cert. denied</u>, 538 U.S. 994 (2003)(quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)); <u>see</u> <u>Tuggle v. Mangan</u>, 348 F.3d 714, 720 (8th Cir. 2003). It follows a few isolated incidents ordinarily will not suffice. <u>Scusa</u>, 181 F.3d at 967. This exacting standard is designed to filter out all claims except those which feature conduct so extreme as to amount to a change in the terms and conditions of employment. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998); <u>see</u> <u>Alagna</u>, 324 F.3d at 980.

The fourth element has both objective and subjective components. The claimed harassment must objectively "be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Singletary v. Missouri Dept. of Corrections</u>, 423 F.3d 886, 893 (8th Cir. 2005); <u>see</u> <u>Henthorn v. Capitol Commun., Inc.</u>, 359 F.3d 1021,

1026 (8th Cir. 2004)(citing <u>Harris</u>, 510 U.S. at 21-22). In analyzing the issue a court should look at all the relevant circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 23; <u>see</u> <u>Faragher</u>, 524 U.S. at 788.

Rewis concedes he was not subjected to sexual conduct or comments. His harassment claim is largely a mirror image of his gender discrimination claim: he was given too much work and too little help to do it, and discriminatorily subjected to the special evaluation. (Pl. Brief at 18; <u>see</u> <u>infra</u> at 21-22). While the acts alleged to support a hostile environment gender harassment claim do not need to be "explicitly sexual in nature," <u>Gillming v. Simmons Indus.</u>, 91 F.3d 1168, 1171 (8th Cir. 1996), a "hostile" environment sufficient to meet the applicable standard implies the acts must be extremely abusive. <u>See</u> <u>generally</u> <u>Quick v. Donaldson Co., Inc.</u>, 90 F.3d 1372, 1377 (8th Cir. 1996)(quoting <u>Harris</u>, 510 U.S. at 21).

Rewis' more difficult work assignment and alleged discriminatory evaluation could not, in the Court's judgment, reasonably be characterized as severe or pervasive harassment. The conduct was not "frequent," nor was it severe, physically threatening, humiliating, offensive or of a kind which would

18

unreasonably interfere with work performance. The work environment disclosed by the record in this case is nothing like what the Eighth Circuit has heretofore found sufficient to make a case for a hostile work environment claim. See Eich v. Bd. of Regents, 350 F.3d 752, 759-60 n.1 (8th Cir. 2003).

Rewis also mentions in passing the comments by Baney which he found objectionable and the episode in which he was forced to sit in front of the meeting with the warden. These were isolated, unremarkable workplace incidents of no legal consequence. The motion for summary judgment will be granted with respect to the gender harassment claim.

## B.   Gender Discrimination

There is no direct evidence of gender discrimination. Accordingly, the parties agree the McDonnell Douglas[5] burden-shifting analysis applies. Under that framework, plaintiff must first establish a *prima facie* case of discrimination, which shifts the burden to the employer to articulate a legitimate, nondiscriminatory reason for the action taken. Plaintiff then must show the reason is a pretext for discrimination. Hammer v. Ashcroft, 383 F.3d 722, 724 (8th Cir. 2004). In this case to establish a *prima facie* case Rewis must show (1) he belonged to a protected class; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) he was treated

_____

[5] 411 U.S. 792, 802-03 (1974).

differently from similarly situated females. <u>Turner v. Gonzales</u>, 421 F.3d 688, 694 (8th Cir. 2005); <u>Duffy v. Wolle</u>, 123 F.3d 1026, 1036 (8th Cir. 1997). Additionally, in reverse discrimination cases -- that is, one in which the alleged discrimination is against a member of the majority, which males still are in the workplace generally -- a plaintiff typically must show an ill-defined something extra to get over the *prima facie* hurdle, <u>viz.</u>, "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." <u>Murray v. Thistledown Racing Club, Inc.</u>, 770 F.2d 63, 67 (6th Cir. 1985)(quoted in <u>Duffy</u>, 123 F.3d at 1036); <u>see</u> <u>Hammer</u>, 383 F.3d at 724 (8th Cir. 2004)(race discrimination). As one court of appeals has put it, the "background circumstances" must "demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something 'fishy' about the facts at hand." <u>Phelan v. City of Chicago</u>, 347 F.3d 679, 684 (7th Cir. 2003)(quoted in <u>Gore v. Indiana University</u>, 416 F.3d 590, 592 (7th Cir. 2005), bracketed language original to <u>Gore</u>). It must be remembered though that "background circumstances," like the <u>McDonnell Douglas</u> analysis itself, is a flexible concept, part of an analytical framework. Consequently, a failure to demonstrate such circumstances, "does not inexorably mean that a [male employee's] employer has not intentionally discriminated against <u>him</u> . . . ," <u>Duffy</u>, 123 F.3d at

1036 (quoting <u>Notari v. Denver Water Dep't</u>, 971 F.2d 585, 590 (10th Cir. 1992)(emphasis original to <u>Notari</u>)).

Defendant targets two elements of the *prima facie* case: adverse employment action and disparate treatment from similarly situated females. In the Court's judgment the closer question is the former as Rewis' deposition testimony is sufficient to raise a fact issue about whether he was treated differently than the female unit managers with respect to job assistance. The unit managers were similarly situated with similar core duties. If Rewis is believed, when the assistant unit managers came on board they were assigned to the female unit managers while he was denied significant assistance with his duties.

Turning to the sufficiency of the showing of an adverse employment action, as the Court understands the briefs and arguments Rewis puts forward two candidates: the failure to provide him job assistance from the assistant unit managers and Baney's special evaluation. In Rewis' theory of the case, the former led to the latter. The special evaluation, however, cannot independently stand as an adverse employment action. "A negative performance review is not itself an adverse employment action" unless "the employer subsequently uses the review to alter the terms or conditions of employment to the detriment of the employee." <u>Burchett v. Target Corp.</u>, 340 F.3d 510, 518 (8th Cir. 2003); <u>see</u> <u>Turner</u>, 421 F.3d at 696. Though the evaluation may have been the

21

initial step toward discharge, that never occurred and shortly after the evaluation Rewis went on a form of medical leave. He was reprimanded in the interim for failing to abide by conditions laid down in the evaluation, but that did not accomplish an alteration in the terms and conditions of his employment. Burchett, 340 F.3d at 518; see Baucom v. Holiday Cos., 428 F.3d 764, 768 (8th Cir. 2005); Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005). So, the focus is on the alleged disparate failure to provide job assistance when the assistant unit managers arrived.

Viewing the summary judgment record favorably to Rewis as the Court must, his version of events is as follows. He was hired in January 2000 as a unit manager with an express representation from Deputy Warden Ort that he would be assigned an assistant unit manager and a secretary or administrative assistant for his unit. That did not happen right away. Nonetheless Rewis performed his duties satisfactorily as shown by Ort's performance evaluation in July 2000. At about that time Baney came on the scene as Ort's replacement. By the end of 2000 Rewis had not completed the handbooks for his unit and was struggling to perform all the responsibilities which had been assigned to him, responsibilities which required more effort than those assigned to the female unit managers.

There was an overall need for additional staff to assist the unit managers, which is the reason the three assistant unit

managers were hired in January 2001 when funds became available to do so. They were assigned to the other, female unit managers. Rewis repeatedly asked for an assistant unit manager on his unit and was denied. He sought assistance on his unit from the assistant unit managers assigned to his female colleagues, a request which was also denied, reportedly by Baney. In short, as Rewis characterizes the evidence, which comes almost exclusively from his own testimony, the prison administration knew he was having difficulty performing all of his job duties, knew that those duties were more time-consuming than those of the other unit managers, and that as a consequence Rewis had a particular need for assistance in performing his job, but did not provide assistance to him when requested. Things came to a head with the special evaluation. Though he had not previously been told his work performance was unsatisfactory, in April 2001 Baney gave Rewis an evaluation which rated his performance unsatisfactory across the board and imposed conditions for improvement which added to his labors resulting in stress to the point he was medically advised to stay away from the institution.

The Eighth Circuit has recently revisited what constitutes an adverse employment action.

> . . .[A]n adverse employment action is a
> tangible change in working conditions that
> produces a material employment disadvantage .
> . . termination, reduction in pay or benefits,
> and changes in employment that significantly
> affect an employee's future career prospects

> meet this standard, but minor changes in
> working conditions that merely inconvenience
> an employee or alter an employee's work
> responsibilities do not.

Sallis v. University of Minnesota, 408 F.3d 470, 476 (8th Cir. 2005)(citations omitted).

Outside the realm of clearly tangible employment actions such as a reduction in salary or loss of employment, what changes in working conditions are sufficient to show a material employment disadvantage is largely a matter of degree. Job assignments resulting in a change of duties with added stress are apt to be viewed as immaterial inconveniences or a mere change in job responsibility. See Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). Undesirable work assignments which do not affect career opportunities generally are not adverse actions. Tuggle, 348 F.3d at 722. On the other hand, at some point increased job responsibilities, a refusal to provide needed job assistance, and a withholding of privileges allowed to other employees may pass beyond inconvenience to amount to a material disadvantage sufficient to constitute an adverse employment action. See Baker v. John Morrell & Co., 382 F.3d 816, 830 (8th Cir. 2004). Here Rewis' claimed adverse employment action is in substance that the denial of the job assistance which became available with the hiring of the assistant unit managers was an employment decision which in light of his disproportionately heavy workload perpetuated a materially disadvantageous employment situation to the point it affected his

24

career prospects through a series of events which led him to seek a demotion to avoid the stress of the job. The context is unusual, and it is a close question, but the Court concludes Rewis has adequately demonstrated an adverse employment action for *prima facie* purposes.

There remains the "background circumstances" *prima facie* requirement in reverse discrimination cases. The State of Iowa, and IDOC in particular, are very large employers with presumably more male employees, however ICIW as a women's prison has a predominantly female supervisory staff and Rewis' supervisor was female. As noted, Rewis claims that the female unit managers with less to do got help from the assistant managers, while he with his extra duties did not. In addition there is Baney's evaluation which rated Rewis' performance unsatisfactory on every criterion, a precipitous performance decline which raises an eyebrow in the case of a 20-year corrections employee who had theretofore provided satisfactory service. This evidence is enough to support a suspicion, and a suspicion is all that is required of the background circumstances, of discrimination against Rewis as a male. <u>See</u> <u>Duffy</u>, 123 F.3d at 1037.

In their reply brief defendants articulate a legitimate nondiscriminatory reason for the initial decision not to assign one of the three assistant unit managers to Rewis' unit which is encapsulated in Warden Wilder-Tomlinson's affidavit as follows:

25

> Richard Rewis was assigned to a lockup
> unit which worked closely with the Duty
> Officer and the Shift Supervisors' office.
> Given this close working relationship, the
> decision was made not to station an assistant
> unit manager in Unit 6B.

(Wilder-Tomlinson Aug. 4, 2005 Aff.) Rewis has not come forward
with any evidence that this reason was not the true reason for the
assignment of the assistant unit managers to other units. However,
fairly viewed Rewis' claim is broader than the assistant unit
manager assignments *per se*. His was a continuing and worsening
problem. He contends he was denied assistance with the kinds of
tasks beyond supervision on the unit which the duty officer or
shift supervisor might have performed, tasks which the assistants
performed for the other unit managers such as classifications,
minor disciplinary reports and associated hearings, problem
resolution and clerical assistance. On this score defendants deny
assistance was unavailable and maintain Rewis had only to ask, but
there is a factual dispute about this. The articulated legitimate
nondiscriminatory reason therefore does not completely respond to
the adverse employment action complained of and does not pass the
burden to Rewis to show pretext. The motion for summary judgment
will be denied with respect to the gender discrimination claim.

## C.   Retaliation

Rewis contends that following his voluntary demotion and
transfer to NCF Warden Mapes and other staff there retaliated
against him in the following ways because he had complained about

26

discrimination while at ICIW and had talked to a lawyer: (1) the assignment of evening and Saturday hours in his new position; (2) denial of requests to take  vacation on Saturdays and a request for one week of vacation in 2003; (3) denial of requests to use flex time for union training; (4) failure of his supervisor to meet with him concerning grievances he had filed; (5) requiring another officer be present when his supervisor did meet with him concerning workplace issues; (6) preventing him from attending a staff meeting in blue jeans on one occasion; and (7) failure to offer Mrs. Rewis a position like that she had occupied before she had been laid off. (Pl. Additional Factual Allegations ¶ 91).

A Title VII retaliation claim is established by proof "(1) that [plaintiff] engaged in a statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." Gilooly, 421 F.3d at 739 (citing Rheineck v. Hutchinson Tech., Inc., 261 F.3d 751, 757 (8th Cir. 2001)). An adverse employment action sufficient to make a case for retaliation is the same as that required for a Title VII discrimination claim proper.

> Each action claimed to be retaliatory must be sufficiently adverse to have created a material change in the employment, "such as a change in salary, benefits, or responsibilities." LaCroix v. Sears, Roebuck, and Co., 240 F.3d 688, 691 (8th Cir. 2001). Not everything that makes an employee unhappy constitutes an actionable adverse employment action. Id. . . . Minor changes in duties or working conditions that do not result in

27

> materially significant disadvantage "do not
> meet the standard of an adverse employment
> action . . . ." <u>Kerns v. Capital Graphics,
> Inc.</u>, 178 F.3d 1011, 1016-17 (8th Cir. 1999).

<u>Henthorn</u>, 359 F.3d at 1028; <u>see</u> <u>Sallis</u>, 408 F.3d at 476. Similar to the <u>McDonnell Douglas</u> analysis discussed previously, a defendant may rebut a retaliation claim by articulating a legitimate non-discriminatory reason for its actions whereupon the burden is upon plaintiff to show the reason is pretextual. <u>Gilooly</u>, 421 F.3d at 739.

Defendants argue none of the things Rewis complains of as retaliatory amount to an actionable adverse employment action. The Court agrees. Only the first and last of the retaliatory acts put forward merit specific comment. The evidence concerning the others is set out <u>supra</u> at 13-15. They are, in the Court's judgment, clearly minor matters which cannot reasonably be viewed as sufficiently adverse as to create a material change in employment conditions.

Rewis' main complaint about his hours concerns the requirement that he work on Saturday.[6] (<u>See</u> Pl. Response to Def. Stmt. of Facts ¶¶ 68, 69). Rewis was the only correctional counselor required to work on Saturdays and there is a factual issue about whether the institution had a need for him to do so,

_____

[6] Rewis has admitted that NCF attempts to have a correctional counselor on every unit in the evening. (Pl. Response to Def. Stmt. of Facts ¶ 68).

28

but the analysis does not proceed to the point of requiring defendants to justify their reasons. To begin with, the Court has two conceptual difficulties with the argument Rewis' work hours were retaliatory. First, the hours were not in any sense a "change" in employment conditions. His was a new job created for him so that he could transfer to NCF. Before he could obtain the job other employees had to be given an opportunity to bid for it. The hours specified for the job were the evening shift Tuesday through Friday and 8:30 a.m. to 4:30 p.m. on Saturday. Those were the posted hours, they were not hidden from Rewis. Rewis did not inquire about the hours he would be required to work prior to accepting the job, or include that subject in his pre-acceptance negotiations with IDOC because, he says, the hours for the position were contained in the PDQ and collective bargaining agreement. The PDQ said nothing one way or the other about Saturday work and the applicable provisions of the collective bargaining agreement are not in evidence. Whether or not Rewis' mistaken assumption about the hours he would be required to work as an NCF correctional counselor was justified, the fact remains he applied for a job which specified the hours and days of work he now contends were retaliatory.

Second, Mapes and his staff created the position for Rewis. That they would thus accommodate his request for a transfer and then retaliate against him in setting his hours seems too Janus-faced to be plausible. In any event, even if Rewis is viewed

29

as having been given an undesirable work assignment, the circumstances do not avoid the general rule that an undesirable work assignment is not *per se* an adverse employment action. See <u>Tuggle</u>, 348 F.3d at 721-22. There is no evidence Rewis' job assignment adversely affected his career opportunities or otherwise imposed a materially significant employment disadvantage. He worked 40 hours a week the same as other correctional counselors, and like others received two consecutive days off, Sunday and Monday. As far as the record indicates, his pay and benefits were not affected.

NCF's failure to interview or hire Rewis' wife was not an adverse employment action against Rewis. In addition, the asserted factual basis for this part of the retaliation claim is bereft of evidential support for the proposition that the failure to interview or hire Mrs. Rewis was causally related to her husband's complaints of discrimination at ICIW.

Mrs. Rewis had also worked at NCF. As put by plaintiff:

> . . . [A]fter Rewis' wife was laid off for budgetary reasons, the Newton facility waited until just after the expiration of the year during which she had the right to return to open positions, to post a "new" position identical to the one from which she had been laid off. Despite her tenure and prior experience, she was not hired for the position and not even given an interview after she applied for the position.

(Pl. Additional Factual Allegations ¶ 91(h)). There is nothing in this recitation which connects the employment action, or non-action, to statutorily protected activity by Mr. Rewis. In support

of this part of his claim, Rewis relies exclusively on Mapes' deposition. (<u>Id.</u>) The sum and substance of what Mapes had to say was that Mrs. Rewis had been a unit manager. For budgetary reasons NCF was required to reduce its staff. Two of the six unit manager positions were eliminated because of the budget cuts. One of those was occupied by Mrs. Rewis. She had the option of remaining employed and taking a demotion to correctional counselor or accepting a lay-off. Mrs. Rewis chose the lay-off. She had recall rights, but Mapes did not know how long they extended. A unit manager position came open. Mapes was not involved in filling the position. An interview panel conducted the selection process and made a hiring recommendation to Mapes who sent it on to an IDOC deputy director. Mapes did not know who made the determination about what applicants to interview and did not know why Mrs. Rewis was not interviewed for the position. (Pl. App. at 134-35). Mapes' testimony does not support Rewis' characterization of what occurred.

The motion for summary judgment with respect to the retaliation claim will be **granted.**

## IV.

### RULING AND ORDER

For the reasons discussed above, defendants' motion for summary judgment [20] is **granted in part and denied in part.** It is granted with respect to plaintiff's claims of gender

31

harassment/hostile work environment and retaliation. It is denied with respect to the claim of gender discrimination at ICIW. This claim will come on before the Court for trial as previously ordered.

IT IS SO ORDERED.

Dated this 15th day of December, 2005.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE